KELLEY v. THOMPSON. See Case No. 4,056.

KELLOGG (ATKINSON v.). See Case No. 613.

## Case No. 7,661.
### KELLOGG et al. v. BARNARD.
[6 Blatchf. 279.] [1]

Circuit Court, D. Connecticut. Dec. 21, 1868.[2]

SALE—SAMPLE—CAVEAT EMPTOR—FALSE PACKING —DAMAGES.

1. On the facts of this case, a sale of wool was *held* not to be a sale by sample, with a warranty that the bulk of the wool should equal certain samples of it.

[Cited in Boyd v. Wilson, 83 Pa. St. 319.]

2. What the rule of caveat emptor is, stated.

3. A custom of the wool trade, which supplies, on a sale of wool in bales, a warranty against its being falsely packed, is valid.

4. Where such a custom exists, qualified by the condition that the seller must, within a reasonable time, be notified and furnished with the marks and numbers of the bales claimed to be falsely packed, the purchaser is entitled, on compliance with such condition, to recover from the seller the damages sustained by reason of false packing.

This was an action on the case, tried before the court without a jury. The court found the following facts: The plaintiffs are merchants, and dealers in wool, at Hartford, Connecticut, and the defendant [George M. Barnard] was a commission merchant, and

1 [Reported by Hon. Samuel Blatchford. District Judge, and here reprinted by permission.]
2 [Reversed in 10 Wall. (77 U. S.) 383.]

an importer of and dealer in foreign wool, at Boston, Massachusetts. George W. Bond & Co. were wool brokers at Boston. On the 13th of July, 1864, said Bond & Co. wrote E. N. Kellogg & Co., who were some of the plaintiffs in this suit, the following letter: "Boston, July 30th, 1864. Messrs. E. N. Kellogg & Co. Gent. We send you to-day, by request of our junior, the following samples of Mestiza wools—961, S. T. 64 bales, No. 1, 50 cents; 962, S. T. 15 bales, No. 1, 50 cents; 963, N. 71 bales Merino, 55 cents; 964, V. 24 bales, No. 1, 50 cents. With 963 there are two low bales at half price. These are the lowest prices we have been able to obtain, and they depend entirely upon gold valuation. We should be happy to hear from you on either or all lots. We remain yours, truly, Geo. W. Bond & Co." This letter, with the samples of wool therein referred to, was received, in due course of mail, by Kellogg & Co. Subsequently, the following correspondence, by telegraph and mail, passed between Bond & Co. and Kellogg & Co.: "To E. N. Kellogg & Co., Hartford. August 2d, 1864. If fifty cents all round is offered for Mestiza wool, may sell. Geo. W. Bond & Co.." "To Geo. W. Bond & Co., Boston. August 6th, 1864. Party will take four lots Mestiza, if they compare with samples, at fifty cents, fifteen days. E. N. Kellogg & Co." "To E. N. Kellogg & Co. August 6th, 1864. Have Mestiza, four lots, but must be examined Monday. Geo. W. Bond & Co." "Boston, August 6th, 1864. Messrs. E. N. Kellogg & Co., Hartford. Gentlemen. Your telegram received, offering 50 cents cash, 15 days, for the 4 lots Mestiza, equal to sample or no sale, and we have closed the wool, for you to be here Monday, without fail. This is our point in the sale, that it must be reported on by that time. You have got a bargain, as the market now stands. Very truly yours, Geo. W. Bond & Co.' The last-named letter was received by Kellogg & Co. on Saturday evening, Aug. 6th. On Sunday evening, the senior member of the firm, E. N. Kellogg, went to Boston. On Monday morning, August 8th, he proceeded to the store of Bond & Co., where a sample bale of each of the lots of wool had been previously sent by the defendant, that they might be examined by such customers as were seeking to purchase. The sample bales were put up in the usual way of Mestiza wool. The wool had been packed at Buenos Ayres, in South America, and brought to this country in iron-bound bales of about 1,000 pounds each. The bales stood on end in the store of Bond & Co., with one or two of the end hoops broken, and the burlaps or bagging, inclosing the same, partially removed. Kellogg proceeded to examine the same in the customary way of purchasers of such wool, by taking up and inspecting the loose places which had been rendered accessible by removing a portion of the hoops. Both the preparation of the bales for examination by

Bond & Co., and the examination of the bales by Kellogg, were in the customary mode observed in the sale of foreign wool of this character. After examining the loose places that were accessible, Kellogg was informed, by Bond & Co., that the bulk of the wool was in the United States bonded warehouse, that he could go and examine it there if he chose, and that the bales would be sufficiently opened for that purpose. He declined to do this, and concluded the purchase on the joint account of all the plaintiffs. In this purchase were seventy-three bales of Mestiza wool, which, it was alleged, were subsequently found to have been falsely and deceitfully packed. This suit related to these seventy-three bales. The examination of the interior of the bulk of bales of wool generally put up like these, was not customary in the trade, and, though possible, would be very inconvenient, and attended with great labor and delay, and, for these reasons, was impracticable. On the 17th of August, the wool purchased was weighed out, paid for, and delivered to Bond & Co., as the agents of the plaintiffs for that purpose. They stored the same in Boston, subject to the plaintiff's order, where it remained till March, 1865. On the 19th of January, 1865, the plaintiffs sold the seventy-three bales in question to Lounsbury, Bissell & Co., of Norwalk, Connecticut, and the same were shipped at Boston to the latter firm, in March, 1865. In April following they proceeded to open some of the bales, to use in their manufactory at Norwalk. They immediately notified the plaintiffs of the condition in which they found the wool in the few bales they had opened. The plaintiffs proceeded to Norwalk, and, after having satisfied themselves of the condition of the wool, notified Bond & Co., on the 1st of May, 1865, that the same was "false packed and damaged," and "entirely different from the samples." This notice to Bond & Co. was immediately communicated to the defendant, who replied by requesting that the marks and numbers of the bales found falsely packed might be sent to him, and promising that he would then examine into the matter, and do what was proper and just. This request and promise were immediately communicated to the plaintiffs. The only visible mark on any of these seventy-three bales, so far as the proof showed, was the mark S. T., being the initials of Samuel Tyler, who bought the wool at Buenos Ayres, had it packed there, and consigned it to the defendant at Boston. This mark was on each bale. The bales were all regularly numbered, and the numbers were marked thereon. The plaintiffs, within a reasonable time, caused to be delivered to the defendant the numbers and weights of twenty-four bales respectively, but not the marks. The defendant then waived his request for, and his right to call for, the marks on these twenty-four bales. The defendant also waived his request for, and his right to call for,

the marks and numbers on eleven other bales, and caused those eleven bales to be examined by his own agents duly authorized for that purpose. As to the remaining thirty-eight of the seventy-three bales, no marks or numbers were ever furnished by the plaintiffs to the defendant, nor did he ever waive his right to call for the same. By the custom of merchants and dealers in foreign wool in bales, in Boston and New York, the principal markets of this country where such wool was sold, there was an implied warranty by the seller to the purchaser, that the same was not falsely or deceitfully packed, and, whenever any such wool was sold, and was, within a reasonable time, found to be falsely and deceitfully packed, the seller, on notice from the purchaser, given in a reasonable time, of the fact of such false packing, and of the marks and numbers on the bales, was bound, by the custom of such merchants, to indemnify the purchaser, and make good to him any loss or damage he might have sustained in consequence of such false and deceitful packing. The seventy-three bales of wool in question were in fact falsely and deceitfully packed, by placing in the interior of them rotten and damaged wool, dirt and dung, which materials were foreign to, and did not properly belong to, or with, the fleeces. This foreign matter was concealed by an outer covering of fleeces in their fair and ordinary state, thus forming a fair but deceitful exterior to the bales. The loss and damage sustained by the plaintiffs in consequence of such false and deceitful packing of the twenty-four bales, the numbers and weights of which they furnished the defendant, and the right to call for the marks of which the defendant waived, was $2,500. The loss and damage sustained by the plaintiffs in consequence of such false and deceitful packing of the eleven bales, the right to call for the marks and numbers of which the defendant waived, was $1,100. The loss and damage sustained by the plaintiffs in consequence of such false and deceitful packing of the remaining thirty-eight bales, was $4,100. When the defendant sold to the plaintiffs the seventy-three bales of wool, he had no knowledge, or reason to believe, that they, or any of them, were falsely or deceitfully packed, and sold the same in good faith, supposing that they were fairly and honestly packed. The defendant was not the absolute exclusive owner of the wool, but it was consigned to him by Samuel Tyler, who bought it in good faith in Buenos Ayres, and the defendant had advanced to Tyler the funds for its purchase. The only interest the defendant had in the wool was in the nature of a lien on the same for his advances and commissions. The plaintiffs bought the wool from the defendant directly, through his brokers, and with no knowledge or reason to believe that any person other than the principal for whom the brokers were acting, had any interest therein. The brokers did not disclose

the name of the defendant till the wool was weighed and billed, nor were they requested to do so before that time. Bond & Co. were employed by the defendant to negotiate for the sale of the wool, as well-known brokers engaged in effecting sales of such merchandise, but they had no express authority to complete a sale without first reporting the conditions or terms to the defendant. The defendant instructed them that he would not sell by sample at all, but would sell if the party would come to Boston, examine the wool, and accept it immediately. This instruction was not known to the plaintiffs, beyond what might be inferred from the fact that they were required to come to Boston and examine the wool, as stated in the telegram and letter before set forth. The examination by Kellogg, at the time he purchased the wool, did not reveal any false packing, nor did he, or any of the other plaintiffs, discover that the same was falsely packed, until the fact was communicated to them by Lounsbury, Bissell & Co., in April, 1865.

SHIPMAN, District Judge. (1.) This was not a sale by sample. Though samples were forwarded to the plaintiffs, and they replied by an offer of "fifty cents all round," provided the bulk equalled the samples, yet the brokers informed them that one point in the sale was, that they must be in Boston on Monday and examine the wool. The telegram and the letter of the 6th of August, from the brokers, taken together, show that it was not their intention to sell without an examination was first made by the buyer. These communications were both of them sent after the offer had been made by Kellogg & Co. to purchase by the samples, and apprized the plaintiffs that the sale must be upon the usual examination of the article. If the plaintiffs intended to rely on the samples, and purchase on that basis, their journey to Boston, and their examination of the bales at the brokers' store, were wholly superfluous. More than this, the examination of the bales at the brokers' store, after notice that such examination was necessary before the contract could be completed, was inconsistent with the idea of a sale by sample, with a warranty that the bulk of the wool should equal the specimens sent to Hartford. The exposure of the few bales at the brokers' store was, in no sense, a presentation of samples warranted to accurately represent the bulk. The object of the exhibition of these bales was doubtless correctly stated by Mr. Kellogg, one of the plaintiffs, who said, in his testimony, that it was "to inspire confidence." It was an appeal to the judgment and discretion of the purchaser. There was no express warranty that the bales not examined should accurately correspond to those exhibited at the brokers' store. The law cannot, under the circumstances, imply such warranty.

(2.) This was a sale where, as to the general character and quality of the goods, the max-

im, caveat emptor, applies. "Where goods are in esse, and may be inspected by the buyer, and there is no fraud on the part of the seller, the maxim, caveat emptor, applies, even though the defect which exists in them is latent and not discoverable on examination, at least where the seller is neither the grower nor the manufacturer. The buyer, in such a case, has the opportunity of exercising his judgment upon the matter; and, if the result of the inspection be unsatisfactory, or, if he distrusts his own judgment, he may, if he chooses, require a warranty. In such a case, it is not an implied term of the contract of sale, that the goods are of any particular quality or are merchantable." Jones v. Just, L. R. 3 Q. B. 197, 202.

(3.) This was a sale under a custom of the trade which supplies a warranty against false packing. The validity of a custom somewhat similar to this was recognized by the supreme court of Massachusetts in Casco Manuf'g Co. v. Dixon, 3 Cush. 407. The court has, in the present case, found that the custom existed, qualified by the condition that the seller must be notified and furnished with the marks and numbers of the bales claimed to be falsely packed. The main practice of the custom, to wit, that there is, in the sale of wool packed in bales as this was, a warranty of the seller against false packing, was proved by the concurrent testimony of many of the witnesses on both sides. The point of difference among them was touching the time within which the buyer must give the seller notice of the fraud and make his claim. On this point there was great diversity of opinion among the defendant's witnesses. But the conclusion which the court arrived at, on the whole evidence, and which it stated in the finding of facts, is, that notice of the fraud, and of the marks and numbers on the bales, must be given to the seller in a reasonable time. This, indeed, is the only practicable rule in connection with, or as a part of, the custom. What a reasonable time is, is a question of fact, to be determined as each case arises.

(4.) The court has found that notice of the fraud was, in this case, given to the seller in a reasonable time; and that, as to the marks and numbers, the numbers on twenty-four bales were furnished the seller within a reasonable time, and the furnishing of the marks was not insisted on, but was waived. As to eleven other bales, it was found that the defendant waived all claim to have the marks and numbers furnished to him. He caused those bales to be examined by his own agents. He must at that time have well known that the wool in question was part of the lot he received on consignment from Tyler. This is doubtless the reason why he did not insist on the marks, when the numbers and weights of the twenty-four bales, severally, were presented to him. All of the seventy-three bales were marked S. T., and this was the only mark, except the numbers, which it was

proved was on the bales. It was by this mark that they were billed to the plaintiffs.

(5.) It follows that the plaintiffs have a right to recover $3,600, being the loss sustained by them on thirty-five bales, the marks and numbers on which were furnished to the seller, or were waived by him. They are entitled also to recover interest at the rate of six per cent. per annum, on that amount, from January 19th, 1865, to the present time.

(6.) As to the loss sustained on the remaining thirty-eight bales, amounting to $4,100, the plaintiffs are not entitled to recover. It was their duty to have furnished the marks and numbers on these bales, or been excused therefrom by the defendant. This part of the custom must be complied with in order to entitle the purchaser to make a valid claim. It may, and often must, be important for the seller to have these marks and numbers, for the purpose of enabling him to identify the article as one sold by him, and furnishing him with the means of resorting to the person who sold or consigned the goods to him. It is easy for the purchaser to furnish the marks and numbers, as they are on the bales. The plaintiffs having failed to comply with this feature of the custom upon which alone they can rely, so far as these thirty-eight bales are concerned, and the defendant never having waived his right to insist on such compliance, the plaintiffs must, to that extent, fail to recover.

[NOTE. The defendants took the case to the supreme court upon writ of error. Mr. Justice Davis here delivered the opinion of the court, saying: "The sale was intended to be upon the usual examination of the article, and the proceeding by Kellogg shows that he so understood it. * * * The parties negotiated on the basis of caveat emptor, and contracted accordingly. This they had the right to do and by the terms of the contract the law placed on the buyer the risk of the purchase, and relieved the seller from liability for latent defects." Upon the question of the operation of the usage of trade the learned justice held that the rule that "usage may be admitted to explain what is doubtful; but never to contradict what is plain" applies. Says he: "It is apparent that the usage in question was inconsistent with the contract which the parties chose to make for themselves, and contrary to the terse rule of law governing the sales of personal property. It introduced a new element into the contract, and added to it a warranty, which the law did not raise, nor the parties intend it to contain." The judgment of the circuit court was reversed, and the cause remanded, with directions to award venire de novo. 10 Wall. (77 U. S.) 383.]